UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MARK NEWMAN,
JENNIFER NEWMAN,

      *Plaintiffs*,

v.                                                          Case No. SA-20-CV-0022-JKP

KERR COUNTY,

      *Defendant*.

### MEMORANDUM OPINION AND ORDER

Before the Court is a motion for summary judgment filed by Defendant Kerr County (the County). *ECF No. 25*. Plaintiffs responded to the motion, *ECF No. 26*, and Defendant replied, *ECF No. 27*. After due consideration, the Court grants the motion in part.

### I. BACKGROUND

This dispute arises out of Plaintiffs Mark Newman and Jennifer Newman's employment with and resignation from the Kerr County Sheriff's Office (KCSO). Mark began working for KCSO in June 2011. *ECF Nos. 26-1; 25-2*. He resigned July 5, 2018. *ECF No. 25-4*. Jennifer began working for KCSO in October 2012. *ECF Nos. 26-1; 25-5*. She resigned April 13, 2018. *ECF No. 25-3*.

The operative complaint, *ECF No. 1*, alleges the County discriminated against Mark when KCSO would not allow him to take his accrued sick leave to care for his children and violated his rights when it did not engage in the interactive process when he requested an accommodation for his disability. The operative complaint alleges the County discriminated against Jennifer when Sheriff William R. Hierholzer (the Sheriff) decided that only she would be allowed to take sick leave to care for Mark's and her children and by failing to protect her from a hostile work

environment. Mark and Jennifer bring claims under Title VII, the Americans with Disabilities Act (ADA), and the Texas Commission on Human Rights Act (TCHRA). Mark brings claims for discrimination and failure to accommodate under the Americans with Disabilities Act (ADA), sex discrimination under Title VII, and the same under the TCHRA, Tex. Lab. Code § 21.051. Jennifer brings claims for sex discrimination and hostile work environment under Title VII, discrimination under the ADA, and the same under the TCHRA.

Plaintiffs filed this action on January 9, 2020. *ECF No. 1*. The matter is now before the Court on the County's Motion for Summary Judgment. *ECF No. 25*.

## II. STANDARD OF REVIEW

A court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material," and a fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Because there must be a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. There is no genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[1] Although 2010 amendments replaced "issue" with "dispute," the summary judgment standard "remains unchanged." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.).

If the movant carries its initial burden, the burden shifts to the nonmovant to present competent summary judgment evidence showing the existence of a genuine dispute of material fact. *Matsushita*, 475 U.S. at 586-87; *see also* Fed. R. Civ. P. 56(c). The nonmovant must identify specific evidence in the record and articulate the precise manner in which that evidence supports its claim. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994); *accord Wright v. United Parcel Serv., Inc. (Ohio)*, 842 F. App'x 869, 872 (5th Cir. 2021) (per curiam). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to [its] case and on which [it] will bear the burden of proof at trial," summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

In determining the merits of a motion for summary judgment, a court views all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion," *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016), but "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Anderson,* 477 U.S. at 254–55.

### III. DISCUSSION

The County asserts it is entitled to summary judgment on all of Plaintiffs' claims for the following reasons: (1) Plaintiffs cannot establish the prima facie elements of any discrimination claim because they resigned and cannot prove constructive discharge; (2) Plaintiffs cannot establish sex discrimination claims because KCSO has a gender neutral sick leave policy; and (3) Mark cannot establish a violation of the ADA because he did not request an accommodation. The County avers generally that Plaintiffs cannot establish the retaliation claim that is brought in the alternative to Plaintiffs' discrimination claims.

3

## A. Title VII and TCHRA

Title VII prohibits employers from intentionally discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment based on the individual's sex or other protected class. 42 U.S.C. § 2000e–2(a)(1); *Roberson v. Alltel Info. Servs.,* 373 F.3d 647, 651 (5th Cir. 2004). The TCHRA was "enacted to address the specific evil of discrimination and retaliation in the workplace," and to "provide for the execution of the policies embodied in Title VII." *City of Waco v. Lopez,* 259 S.W.3d 147, 153–55 (Tex. 2008); *accord Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 504 (Tex. 2012). "The Supreme Court of Texas has instructed Texas courts to consult judicial interpretations of Title VII and follow the approach of the United States Supreme Court in interpreting Title VII when reviewing TCHRA claims." *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 321 (5th Cir. 2021) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633–34 (Tex. 2012)).

Intentional discrimination claims are generally analyzed according to the *McDonnell Douglas* burden-shifting framework. *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020); *Harville v. City of Houston*, 945 F.3d 870, 874-75 (5th Cir. 2019). Under *McDonnell Douglas*, the plaintiff first establishes a prima facie case; the burden then shifts to the defendant to articulate "some legitimate reason" for the adverse employment action; if the employer provides such a reason, the burden shifts back to the plaintiff to show that the reason is a pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973).

## 1. Hostile Work Environment

Title VII's ban on intentionally discriminatory employment practices extends to conduct that creates a hostile work environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66 (1986); *accord Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v.*

*Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)); *EEOC v. Boh Bros. Const. Co.*, 731 F.3d 444, 452 (5th Cir. 2013). An employer violates Title VII when the employer allows the workplace to be "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" *Forklift Systems, Inc.*, 510 U.S. at 21 (internal quotations and citations omitted). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

A plaintiff establishes a hostile work environment prima facie case by demonstrating: (1) she is a member of a protected group; (2) she was the victim of unwelcome harassment; (3) the harassment was based on her membership in the protected group; (4) the harassment affected a term, condition, or privilege of her employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002); *accord Wright*, 842 F. App'x at 874.

The County's basis for summary judgment is that Jennifer cannot establish that any harassment affected a term, condition, or privilege of her employment because she resigned and cannot prove constructive discharge. *ECF No. 25* at 6, 8. Constructive discharge is an involuntary termination of employment; it occurs when "working conditions become so intolerable" an employee feels "compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004); *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001); *Young v. Southwestern Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975).

> The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

*Young*, 509 F.2d at 144; *accord Haley v. All. Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004).

Courts analyze constructive discharge claims under an objective standard, looking at the facts of each case to answer: "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Suders*, 542 U.S. at 141. In determining whether working conditions were intolerable, courts consider specific events, including:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not.

*Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994). "Whether an employee would feel forced to resign is case- and fact-specific," *Haley*, 391 F.3d at 649, but proving constructive discharge is a "high burden," *El-Hajjami v. United Med. Ctrs.*, No. DR-13-CV-070-AM-CW, 2015 U.S. Dist. LEXIS 193119, at *25, 2015 WL 11545025, at *9 (W.D. Tex. Apr. 1, 2015).

Jennifer contends she resigned because she was repeatedly subjected to vulgar sexual conversations, abusive taunts, and rude behavior. She also contends when she questioned the "order" that she be the one to take leave when the children were ill, the Sheriff threatened to fire her and balled up her complaint and threw it at her. Additionally, the Sheriff's "order" that she be the one to take leave to care for the children cost her a substantial sum of money.

First, the hostile work environment incidents Jennifer describes do not establish the severity or pervasiveness necessary to support a finding of constructive discharge. To prove a constructive discharge claim, "[m]ere harassment, alone, is insufficient; rather, the plaintiff must show 'aggravating factors' to justify departure." *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 331 (5th Cir. 2004). *Cf. Haley*, 391 F.3d at 650, 653 (no constructive discharge where

employer fabricated deficiencies, set an overly strict performance plan, threatened firing, and micromanaged, excluded, and ridiculed the employee); *Webb v. Cardiothoracic Assocs. of North Texas, P.A.*, 139 F.3d 532, 539–40 (5th Cir. 1998) (affirming summary judgment in favor of employer where the employee was harassed, demeaned, and publicly humiliated by a supervisor); *Landgraf v. USI Film Products*, 968 F.2d 427, 429–30 (5th Cir. 1992) (concluding that even though the evidence was sufficient to prove sexual harassment and hostile work environment, it was insufficient to prove constructive discharge because "while substantial" the harassment "did not rise to the level of severity necessary for constructive discharge"). As the Fifth Circuit pointedly states: "Title VII is an anti-discrimination law, not a general civility code." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 21 (5th Cir. 2020) (per curiam) (referencing *West v. City of Houston*, 960 F.3d 736, 742 (5th Cir. 2020) (discussing what is required to show "that the harassment has affected a term, condition, or privilege of employment").

Next, Jennifer equates the costs associated with taking unpaid leave to a reduction in salary, because it cost her "thousands of dollars." The Fifth Circuit has found constructive discharge where, *inter alia*, the employee's salary has been cut significantly. *See, e.g., Stephens v. C.I.T. Group/Equip. Fin., Inc., infra.* But the mere allegation that she lost thousands of dollars provides no basis for the Court to conclude that Jennifer's monetary loss was significant.

Finally, Jennifer contends the Court must find constructive discharge because the Sheriff threatened to fire her if she complained about the sick leave policy. In *Faruki v. Parsons S.I.P., Inc.*, in which the court reversed the grant of summary judgment on a constructive discharge claim, deposition testimony showed that the employer told the employee: (1) that he should find another job; (2) that the employer would be unable to retain him; (3) and that the employee had one week before he would be placed on indefinite unpaid leave, 123 F.3d 315, 319 (5th Cir. 1997).

Importantly, *Faruki* focused on the immediacy of the threatened unemployment, citing *Burks v. Oklahoma Pub. Co.,* 81 F.3d 975, 978 (10th Cir. 1996), focusing on the employee's "choice between resigning or being fired," and *Jenkins v. State of La., Through Dep't of Corrs.,* 874 F.2d 992, 996 (5th Cir. 1989), noting that the employee had been given an "ultimatum" to quit or be fired. In *Perret v. Nationwide Mut. Ins. Co.*, the court observed that "in these ultimatum cases, courts have required something beyond the employee's subjective belief that termination was inevitable," 770 F.3d 336, 339 (5th Cir. 2014).

The Fifth Circuit has opined that "a reasonable employee often should pursue less drastic options before choosing to leave her job." *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 482 (5th Cir. 2008) (citing *Haley,* 391 F.3d at 652); *cf. Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 343 (5th Cir. 2005) (same); *McKethan v. Texas Farm Bureau*, 996 F.2d 734, 741 (5th Cir. 1993) (same); *Boze v. Branstetter,* 912 F.2d 801, 805 (5th Cir. 1990) (same). This Court observes that Jennifer filed a harassment complaint and was not fired. Additionally, if the Sheriff threatened to fire Jennifer if she complained about his "order" regarding sick leave, Jennifer had several options before resigning, such as reporting to Sgt. Berens, Cpt. Prout, or Chief Barton or filing a complaint with the Equal Employment Opportunity Commission. There is no evidence that Jennifer reported the alleged ultimatum to anyone else within KCSO or the County.

Collectively, Jennifer alleges: (1) over a period of six months, her co-workers subjected to her sexually explicit conversations, belittled, demeaned, and yelled at Jennifer in front of co-workers and customers, called her names, changed the settings on her chair, slammed a door on her, and removed supplies and files from her desk; (2) for approximately three years, the Sheriff made her take unpaid leave to care for her children when they were ill and threatened to fire her if she complained about it; (3) the Sheriff's sick leave order cost her thousands of dollars.

However, even taken all together, the Court cannot find that these facts are similar to those on which the Fifth Circuit has found constructive discharge. For example, in *Stephens v. C.I.T. Group/Equip. Fin., Inc.*, the Fifth Circuit found constructive discharge where all of the following occurred: (1) the plaintiff had been demoted, asked to train his young successor, and asked to explain his demotion and introduce the successor as his new boss to the division's biggest client; (2) while he had formerly supervised the entire San Antonio Division, the plaintiff was now only "permitted to assist the Credit Department as needed" and "whenever possible, he must have a member of the credit department along as designated by Division Management"; (3) "his salary was reduced from $53,500 to $43,200 after he had been told that there would be no reduction in his salary"; and (4) each time the employer "imposed a new restraint" or "cut his salary or responsibility," the employer "asked him whether he was going to quit his job," 955 F.2d 1023, 1027–28 (5th Cir. 1992). Similar facts are simply not present in the evidence in this case.

Even if Jennifer could establish constructive discharge, the Court finds that Jennifer cannot establish the final element of the prima facie case: that the employer knew or should have known of the harassment and failed to take prompt remedial action. *Ramsey*, 286 F.3d at 268. Jennifer alleges that her co-workers harassed her and that the chain of command including the Sheriff "did nothing to protect her." *ECF No. 1* at 4. The evidence shows that Jennifer filed a formal complaint on December 11, 2017, and supplemented this with notes she took during the relevant time period. *ECF No. 25-5* at 2-14. Jennifer's formal complaint and notes detail her co-worker's sexually explicit conversations and their attempts to engage Jennifer in these conversations; her co-worker's rude behavior, including belittling, demeaning, and yelling at Jennifer in front of co-workers and customers; her co-worker's meanspirited name calling, such as tattletale, squealer, and whiner; and spiteful conduct including changing the settings on Jennifer's work chair when she would

leave the office (then laughing as she struggled with the chair on her return), slamming a door shut knowing Jennifer was following the co-worker through the door, and removing supplies and files from Jennifer's desk. *Id.*

The Sheriff and Sergeant Behrens (Jennifer's supervisor) investigated the complaint by taking written statements from Jennifer's co-workers and speaking with some employees after they had completed their statements. *Id.*; *ECF Nos. 25-2* at 30, 34-35; *25-5* at 15-40. Additionally, Sgt. Behrens drafted a memo, addressing each item in Jennifer's notes. *ECF No. 25-5* at 25-32.

The Sheriff testified by deposition that at the close of the investigation, he concluded that "what was going on" in Jennifer's work area was "not harassment" but "personality conflicts." *ECF No. 25-2* at 29, 33-34. "And what I came to in the end, I think it was pretty well summed up by one of the coworkers"—

> Jenny, being Jennifer Newman, Amanda and Beverly were close friends. Each harassed each other constantly, making derogatory remarks to each other all the time. This was not done behind anyone's back but in person. None of the parties appeared to take offense and all parties gave as good as they got. I learned that Amanda and Jenny were high school – went to high school together and retained what I call a high school mentality for communication, [consisting] of ragging on each other all the time. Beverly was referred to as "Aunt Beverly" by Jenny. And it just goes on to show how close they were, okay, and they harassed and talked to each other like that all the time. This is an area where it was several women, that Amanda was the dispatch supervisor, Beverly was the receptionist, and Jenny, of course, was the warrant receptionist, and they all had to work closely together . . .

> And so once I got through that full investigation, what I saw was what, unfortunately, went from very close friendships to personality conflicts. And then I moved Jenny out of there and moved her to another desk, and we tried a lot of different things to resolve the personality conflict.

*ECF No. 25-2* at 29, 32-33.

The Sheriff testified that an immediate supervisor and a patrol captain had "visited with" Beverly and Jennifer about the difficulties between them. *Id.* 28-29. The Sheriff further testified that after the investigation, he spoke with the employees about "the way they harassed each other

all the time" because he does not "necessarily approve of any of that kind of stuff." *Id.* at 37. And so, he "talked to all of them" and told them "they shouldn't be acting like that; we needed to keep it, you know, clean and professional." *Id.*

Ultimately, the Sheriff told Jennifer that he could not substantiate her complaint, but was willing to move her workstation. *Id.* at 35. Jennifer was moved to another location but because the building was being remodeled, she was moved several times. First, "to get [Jennifer] away from Beverly," the Sheriff moved Jennifer to another warrant officer's desk. *Id.* at 39. Later, the Sheriff moved Jennifer "to a totally different part of the building," which required getting "IT to hook up a computer and phone . . . and an intercom up to the front" to facilitate Jennifer filling in when Beverly was on meal and rest breaks. *Id.*

Jennifer does not acknowledge this evidence in her response to the County's motion. *ECF No. 26* at 5. Instead, she stands on her affidavit, in which she states that KCSO "did nothing to protect her from the harassment." *ECF No. 26-2* ¶ 11. An "affidavit can create genuine issues of material fact that preclude summary judgment even if the affidavit is self-serving and uncorroborated." *Lester v. Wells Fargo, Bank*, 805 F. App'x 288, 289 (5th Cir. 2020) (J. Higginson) (citing *United States v. Stein*, 881 F.3d 853, 859 (11th Cir. 2018) (en banc)). But if the affidavit "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

The record is clear that KCSO did not "do nothing" in response to Jennifer's complaint about harassment. The evidence proves that the Sheriff conducted an investigation and is replete with references to moving Jennifer's workstation in response to her complaint. The Sheriff testified that after he investigated Jennifer's complaint, he moved her workstation. *ECF No 25-2* at 33. Sgt.

Behrens's memo reflects that he and Captain Prout "got with Beverly" and asked her to "keep it professional until we can resolve the issue with Jennifer moving." *ECF No. 25-5* at 30. Behrens's memo also states that on December 12, 2017, the Sheriff directed him to "move Jennifer over to Deputy Schultz's desk." *Id.* at 31. Sgt. Behrens flagged Jennifer's concerns up the chain of command, including to Cpt. Prout. *Id.* at 30, 32.

Cpt. Prout memorialized that Sgt. Behrens had come to his office to advise that Jennifer had made a complaint. *Id.* at 38. In response to the information received from Sgt. Behrens, Cpt. Prout "asked Beverly to do her best to get along with Jennifer and advised that Jennifer had requested to move back to the warrants office and we were waiting for furniture to arrive for her, and asked her help in getting along with Jennifer while the transition was being worked on." *Id.* Jennifer's complaint and notes express frustration at the delay in putting her desk together. *Id.* at 2, 12.

The Court views facts in the light most favorable to the nonmoving party and "may not make credibility determinations or weigh the evidence." *Reeves, Inc.,* 530 U.S. at 150. However, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586–587. Jennifer's affidavit, which states, "I repeatedly complained about this harassment to the Sheriff and through my chain of command, but Kerr County and KCSO did nothing to protect me from this harassment," does not meet this burden. *ECF No. 26-2* ¶ 11. Particularly because Jennifer's response to the motion for summary judgment does not acknowledge or address the evidence presented by the County. The Court read the briefing and all evidence submitted by the parties. And upon review of the record in its entirety, the Court concludes that a rational trier of fact could not find in favor of Jennifer on her hostile work environment claim. Jennifer's hostile

work environment claim fails because she cannot establish her prima facie case and summary judgment is granted in favor of the County.

## 2. Sex Discrimination

Both Mark and Jennifer bring claims for discrimination based on their sex. To establish their prima facie cases of sex discrimination, each must demonstrate that he or she: (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) the circumstances are such that an unlawful discriminatory reason for the adverse employment action can be inferred, *i.e.*, that the employee was "treated less favorably than those outside the protected class." *Okoye v. Univ. of Texas Houston Health Science Ctr*, 245 F.3d 507, 512-13 (5th Cir. 2001); *Rutherford v. Harris Cty*, 197 F.3d 173, 184 (5th Cir. 1999).

"[A]n adverse employment action consists of 'ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating.'" *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (quoting *Felton v. Polles*, 315 F.3d 470, 486 (5th Cir. 2002)). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981). *See Richardson v. Prairie Opportunity, Inc.*, 470 F. App'x 282, 285 (5th Cir. 2012) (per curiam) (concluding that the plaintiff made his *prima facie* case of discrimination by establishing his protected characteristic, qualification for the job, adverse employment action, and presenting "evidence that he was treated more harshly than the female employees in the central office— *e.g.,* was the only employee required to sign upon receipt of memoranda, was singularly undermined [by the Executive Director] in front of the staff, and was 'written up' for projects he had completed").

Mark and Jennifer allege the County discriminated against them because Jennifer was required to use unpaid leave to care for their ill children while Mark was not allowed to use his accrued sick leave to care for their ill children. *ECF No. 1* ¶¶ 7-10, 13. The County asserts that neither Mark nor Jennifer can establish a prima facie case of sex discrimination because the County does not have a policy that requires "the wife employee to take time off to care for children as opposed to the husband employee." *ECF No. 25* at 9. In the evidence attached to their summary judgment response, Mark attests:

> KCSO allows employees to use sick leave to care for ill or injured family members.
>
> In 2015, our children were having issues with illnesses, and my wife and I were both taking sick leave to care for them. During that time period, I was [told] that I was prohibited from using sick leave to care for our children when they were ill and that my wife would be the only one allowed to use sick leave for this purpose.
>
> My wife complained to Sheriff Hierholzer about this order. The Sheriff responded by saying that it was [his order], that it is my wife's responsibility to care for our children when they are sick, that the order is not open for discussion, and that if my wife complained again, he would fire her.
>
> The order that only my wife could use sick leave to care for our children when they were ill continued even after she exhausted her paid sick leave, and the KCSO forced her to use unpaid leave instead of allowing me to use my accrued sick leave like any other employee could. This order cost my family thousands of dollars.
>
> Despite the Sheriffs order, I continued to request the use of sick leave to care for our children when they were ill. I had such requests denied by my supervising officer on April 16, 2015; May 29, 2015; July 10, 2015; July 28, 2015; September 17, 2015; February 10, 2016; February 11, 2016; June 10, 2016; January 31, 2018; February 1, 2018; February 22, 2018; and April 10, 2018.
>
> It was made clear to me that all such requests would be denied, so I did not request to use leave every time I needed to use it to care for ill children, because I did not want to be retaliated against.

*ECF No. 26-1* at 1-2. Jennifer attests:

> KCSO allows employees to use sick leave to care for ill or injured family members.

In 2015, our children were having issues with illnesses, and my husband and I were both taking sick leave to care for them. During that time period, my husband told me that he was prohibited from using sick leave to care for our children when they were ill and that I would be the only one allowed to use sick leave for this purpose.

I complained to Sheriff Hierholzer about this order. The Sheriff responded by saying that it was [his order], that it is my responsibility to care for our children when they are sick, that the order is not open for discussion, and that if I complained again, he would fire me.

The order that only I could use sick leave to care for our children when they were ill continued even after I exhausted my paid sick leave, and the KCSO forced me to use unpaid leave instead of allowing my husband to use his accrued sick leave like any other employee could. This order cost my family thousands of dollars.

When I complained to the human resources department about the Sheriffs order, the Sheriff took the written complaint, crumpled it up, and threw it at me.

*ECF No. 26-2* at 1-2.

Based on their sworn affidavits, Mark and Jennifer have each established a prima facie case of sex discrimination: (1) their protected classes (male and female) are undisputed; (2) as are their qualifications for their respective positions;[2] (3) the adverse employment actions were Jennifer being forced to take unpaid leave and Mark being denied leave that he was entitled to;[3] and (4) they were treated less favorably than other County employees, including other married couples with children, who were all allowed to use sick leave to care for ill family members.[4]

---

[2] The Sheriff testified that Mark "was an excellent employee" and he tried to "get him not to quit." *ECF No. 25-2* at 24-28, 62-63. Two employees stated that they heard the Sheriff tell Mark he could be re-hired. *ECF No. 25-8* at 3-4. Defendant did not challenge Jennifer's qualifications in the motion for summary judgment and the Sheriff gave no testimony as to the quality of Jennifer's work. *See generally, ECF Nos. 25; 25-2*.

[3] *Cf. Peterson v. Linear Controls, Inc.*, 757 F. App'x 370, 373 (5th Cir. 2019), *cert. dismissed*, 140 S. Ct. 2841 (2020) (noting that denial of leave is an adverse employment action); *Clark v. Charter Commc'ns, L.L.C.*, 775 F. App'x 764, 767 (5th Cir. 2019) (per curiam) (noting that being forced to take unpaid leave may be an adverse employment action but the inquiry is fact-specific); *McElroy v. PHM Corp.*, 622 F. App'x 388, 391 (5th Cir. 2015) (per curiam) (opining that the general denial of paid leave may constitute an adverse employment action) (citing *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 521–23 (5th Cir. 2001)); *Pegram*, 361 F.3d at 282 (concluding that "an adverse employment action consists of 'ultimate employment decisions such as . . . granting leave'").

[4] *See Richardson*, 470 F. App'x at 285 (finding that evidence that the plaintiff "was treated more harshly than the female employees in the central office" was sufficient to establish the prima facie element that he was "treated less favorably than employees outside [his] protected class").

Having established a prima facie case, the burden shifts to the County to articulate a legitimate, nondiscriminatory reason for its actions. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000); *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254–56 (1981). The County asserts KCSO's sick leave policy did not require wife employees to take sick leave to care for children while denying the same to husband employees; that KCSO's gender neutral sick leave policy was applied to all employees in the same way; that Mark was not denied sick leave to care for his children; that Jennifer was not required to take unpaid leave to care for her children; and that Jennifer "made up" her allegations that the Sheriff said he would fire her if she complained again and that he crumpled up her complaint and threw it at her. *ECF Nos. 25* at 8-9; *25-2* at 42-44, 64-65.

The Sheriff testified that he could recall one time Mark was denied leave to care for one of his children but the leave was denied only because Mark was at court and, because another employee was on sick leave that day, there was no one to cover for him. *ECF No. 25-2* at 43-44, 49. The Sheriff further testified to a memo drafted by Sergeant Behrens that identifies two times Mark was not allowed to take leave, one of those times being the day Mark was in court. *Id.* at 50. He explained any denial of leave thusly:

> We have one county policy that covers all county employees about sick leave, and it's the same for every one of them, and they can all work it together. The thing we do when you have a husband and wife, is we let the husband and wife work out who's going to be with the sick kids if that -- you know, if that's what it is.
>
> Now, the only time [I] have to step in is, hers is more of a clerk, you know, warrant secretary, clerk, whatever you want to call it, and his was a corporal in the jail; and by jail standards, I have to have so many people on duty at a time for, you know, things like that on guarding inmates.
>
> So there may have been a time that he was denied, like the one I just told you, okay? Or in other words -- But, no, there's not a set policy. We try and let them work that out.

16

*Id.* at 44-45.

The Sheriff denies that he ever had a conversation with Jennifer or Mark about who needed to use sick leave to take care of their children, stating, "I would not have had that conversation." *ECF No. 25-2* at 54. He specifically testified:

> Q. So you did not tell either Mark or Jennifer that it's the woman's job to take care of the kids, right?
> A. I would never have said anything like that.
> Q. And, again, I'm probably beating a dead horse, but just so I've got a clear record: You never told either Mark or Jennifer that it was your rule that Jennifer, as the wife, had to use sick leave when one of the kids was sick?
> A. No. Like I said, I wouldn't say that.

*Id.* at 54.

The summary judgment evidence includes a memo dated September 18, 2018, from Jail Administrator Sylvia Foraker to the Sheriff, which describes how Ms. Foraker processes the jail officers' schedules. *ECF No. 26-3.* In the memo, Ms. Foraker states that jail officers worked 160 hours in a pay period consisting of thirteen twelve-hour days and one four-hour day. *Id.* She further states that she could not recall ever denying anyone leave for any reason and when both a husband and wife worked for KCSO, they "always worked out between them . . . who would take off with the children." *Id.* The memo also memorializes Ms. Foraker's memory of a conversation with Mark in which she told Mark

> that he and his wife Jenny needed to work it out where he was not always the one taking off. I told him I need to have him here when he was scheduled because I needed the [manpower] and when he took off I would have to call someone in to replace him. I was very concern[ed] at how much he was asking to take off with his kids so I went to visit with you [the Sheriff] on this. All I can remember now is that you were going to visit with both [Mark and Jennifer].

*Id.* The evidence also includes records, printed on May 17, 2018, documenting Mark's leave. *ECF Nos. 26-4; 26-5.* In his deposition, the Sheriff agreed that that the records show that after 2015,

until his resignation, Mark did not take "a lot of sick leave to deal with the children." *ECF No. 25-2 at 60.*

Upon the evidence presented, the County has not met its burden of production to articulate legitimate, non-retaliatory reasons for its actions. Rather, the County's evidence presents a genuine dispute of material fact as to whether the Sheriff in fact required Jennifer to take unpaid leave while denying Mark use of his accrued leave to care for the children. In other words, whether Jennifer and Mark were subject to a discriminatory policy or "order." The dispute is material because resolution "might affect the outcome of this case." *Roy v. City of Monroe*, 950 F.3d 245, 254 (5th Cir. 2020). Proof that the Sheriff prohibited Mark from using sick leave to care for his children when they were ill; that only Jennifer was allowed to use sick leave for this purpose; that Jennifer was forced to take unpaid leave when Mark had accrued leave that he was eligible to take; that the Sheriff told Jennifer if she complained again, he would fire her; or proof that the Sheriff balled up Jennifer's complaint and threw it at her might establish intentional discrimination. On the other hand, proof that the sick leave policy was gender neutral and applied equally to all employees including Mark and Jennifer might defeat Plaintiffs' claims.

The dispute is genuine because Mark and Jennifer have presented sufficient evidence in their affidavits for a reasonable jury to return a verdict in their favor. "A non-conclusory affidavit can create genuine issues of material fact that preclude summary judgment even if the affidavit is self-serving and uncorroborated." *Lester*, 805 F. App'x. at 289. Although "broad legal or factual assertions in an affidavit that are unsupported by specific facts are generally held to be conclusory," a more "detailed and fact-intensive affidavit can raise genuine issues of material fact that preclude summary judgment." *Id.*

Although arguably self-serving, Jennifer and Mark's affidavits are not conclusory and are based on personal knowledge, which creates a genuine issue of fact that overcomes summary judgment. "A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment" *C.R. Pittman Const. Co. v. Nat. Fire Ins.*, 453 F. App'x 439, 443 (5th Cir. 2011) (citation omitted).

And with respect to this dispute, Jennifer and Mark's affidavits are not "blatantly contradicted by the record." *Scott*, 550 U.S. at 380. Rather, the record in this case "presents a quintessential example of the classic 'he said, she said' swearing match, making it obvious that [the County's] summary-judgment motion turns entirely on a genuine issue of fact that is clearly material." *Faulkenbery v. Lee*, 307 F. App'x 813, 814 (5th Cir. 2009); *Jonibach Manag. Trust v. Wartburg Enterprises*, 136 F. Supp. 3d 792, 822 (S.D. Tex. 2015). Namely, the County's account is supported by the Sheriff's deposition, while Plaintiffs' accounts are supported by their affidavits. In light of this classic "he said, she said" situation, the Court finds that a triable dispute remains. Therefore, the Court denies summary judgment on Jennifer and Mark's sex discrimination claims.

### 3. Retaliation

Plaintiffs' retaliation claims are brought as an alternative to their discrimination claims— "discrimination and/or retaliation"—in the prayer for relief section of the operative complaint. While the Federal Rules permit alternative pleading, Fed. R. Civ. P. 8(d)(2), the pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Rule 8(a)(2), and allege facts that—at the least—nudge the claim "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). Plaintiffs' passing remark in the prayer for relief does not satisfy these

standards. Moreover, Plaintiffs are represented by counsel, thus, the Court has no obligation to liberally construe their pleading. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

The County's motion for summary judgment is equally lackluster in stating the basis for their motion on Plaintiffs' retaliation claims. *ECF No. 25* at 8-9. In response to the motion, Plaintiffs merely tack-on retaliation, including it in the title of one section and, apparently, now argue that only Jennifer was subject to retaliation. *ECF No. 26* at 5, 7. There is no reference to retaliation in Defendant's reply. *ECF No. 27*. Therefore, neither Plaintiffs nor Defendant appear to seriously contend that any retaliation claim is viable. Consequently, as to Plaintiffs' retaliation claims, summary judgment in favor of the County is appropriate.

## B. ADA and TCHRA

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability." *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017) (quoting 42 U.S.C. § 12112(a)). TCHRA "parallels the language of the [ADA]." *Pegram*, 361 F.3d at 285–87. Thus, "Texas courts follow ADA law in evaluating TCHRA discrimination claims." *Williams v. Tarrant Cty. Coll. Dist.*, 717 F. App'x 440, 445 (5th Cir. 2018) (per curiam). To establish a *prima facie* discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; (3) that he was subject to an adverse employment decision on account of his disability. *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999) (citations omitted) *accord E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014).

"Discrimination includes failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless . . .

the accommodation would impose an undue hardship.'" *Feist v. Louisiana*, 730 F.3d 450, 452 (5th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)(A)). To prevail on a failure to accommodate claim, a plaintiff must establish that "(1) he is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) (citations omitted); *accord Jennings v. Towers Watson*, No. 19-11028, ___ F.4th ___, 2021 WL 3754753, at *5 (5th Cir. Aug. 25, 2021). "A disabled employee is entitled only to a reasonable accommodation, not the employee's preferred accommodation, and has no right to a promotion or to choose a job assignment." *Stringer v. N. Bolivar Consol. Sch. Dist.*, 727 F. App'x 793, 801 (5th Cir. 2018) (per curiam) (citing *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011)). Reasonable accommodations include:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*LHC Grp., Inc.*, 773 F.3d at 697 (quoting 42 U.S.C. § 12111(9)(B)).

A plaintiff who does not identify any request for accommodation fails to establish a claim. *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 587 (5th Cir. 2020). "[W]here the disability, resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 444 (5th Cir. 2017) (quoting *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009) (ellipsis in original)). "Once an

employee makes such a request, however, the employer is obligated by law to engage in an interactive process: a meaningful dialogue with the employee to find the best means of accommodating that disability." *Chevron*, 570 F.3d at 621 (internal quotations omitted). "A failure-to-accommodate claim provides a mechanism to combat workplace discrimination even when the employee in question *has not* suffered adverse employment action." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 703 (5th Cir. 2014) (emphasis in original) (citing *Bridges v. Dep't of Soc. Servs.,* 254 F.3d 71, 71 5th Cir. 2001)).

**1. Reasonable Accommodation**

Mark alleges that KCSO did not engage in the interactive process when he requested a reasonable accommodation. The County contends that Mark cannot establish a reasonable accommodation claim because he never asked for one.

Mark injured his shoulder outside of work on May 18, 2018. *ECF No. 1* at 3. Mark requested and was approved leave under the Family and Medical Leave Act (FMLA). *Id.* Mark testified by affidavit that he was given the "illegal directive" that he "was required to be 100 [percent] healed to return to work" at the end of his FMLA leave. *ECF No. 26-1* at 2. Mark further testified that he was told that if he was unable to return to work with "no restrictions on the day [his] FMLA leave expired, [his] employment would be terminated" and that if he knew that he "would not be able to return to full duty with no restrictions on the day [his] FMLA leave expired, [his] use of FMLA leave could be considered fraudulent, and [he] could be forced to repay insurance premiums paid by the County during [his] FMLA leave period." *Id.* When it was time for Mark to return to work, the Sheriff refused Mark a light duty position and instructed him to find a doctor willing to give Mark clearance to return to full duty. *Id.* at 3. Ultimately, the Chief told Mark that KCSO "could not continue to employ [him] after [his] FMLA leave expired unless

Case 5:20-cv-00022-JKP   Document 28   Filed 09/07/21   Page 23 of 24

[he] was released to full duty" and Mark was forced to resign. *Id.* at 3-4.

Mark contends that the County denied his requests for a reasonable accommodation of either transfer to a vacant dispatch position, which he could have performed consistent with his medical restrictions, or additional unpaid leave, and the County did not offer any alternate reasonable accommodation. Instead, they told Mark that his employment would be terminated if he was not released for full duty without any restrictions when his FMLA expired. *ECF Nos. 26* at 8; *26-1* at 3. The County contends Mark did not ask for an accommodation. *ECF Nos. 25* at 10; *25-2* at 22-24. This evidence presents conflicting testimony. Mark attests that he requested an accommodation; the County claims he did not. Resolving this disputed fact requires weighing the testimony and credibility of witnesses. Because this is the province of the trier of fact, summary judgment on Mark's reasonable accommodation claim is denied.

## 2. Discrimination

Plaintiffs purport to bring an ADA claim on the basis that the County discriminated against them "by denying equal use of sick leave because of the known disability of their child." *ECF No. 1* at 5. The facts alleged do not support this claim.

Jennifer and Mark allege that KCSO denied equal use of sick leave because the Sheriff issued a directive grounded in sex-based stereotypes. Plaintiffs specifically allege:

> In or around March 2015, the Newmans' children were having issues with illnesses. One of their children has an illness that qualifies as a disability under the Americans with Disabilities Act (ADA) and Chapter 21 of the Texas Labor Code: Juvenile Rheumatoid Arthritis. Mark and Jennifer Newman were both taking sick leave to care for them. During that time period, Mark Newman was told that he was prohibited from using further sick leave to care for the couple's children when they were ill, and that Jennifer Newman would be the only one allowed to use sick leave for this purpose from that point forward.

> When Jennifer Newman complained to the Sheriff about this order, the Sheriff said that it was the Sheriff's order, that it is Jennifer's responsibility to care for the couple's children when they are sick, that the order is not open for discussion, and

that if Jennifer complained again, the Sheriff would fire her.

This discriminatory treatment continued even after Jennifer exhausted her paid sick leave, and KCSO forced Jennifer to use unpaid leave to care for the couple's children when they were ill instead of allowing Mark to use his accrued sick leave like any other employee could.

*ECF No. 1* at 2-3. Nothing in Plaintiffs' allegations suggests that the child's disability was related to the alleged "order" that Jennifer use her sick leave to care for the children. In their response to the County's motion, Plaintiffs argue that

forcing Mrs. Newman to take unpaid leave when Mr. Newman had paid leave that he could have and should have been able to use . . . was based solely on sex and sex-role stereotypes, in violation of Title VII. The Sheriff still uses the discriminatory "differential leave policies . . . attributable to . . . the pervasive sex-role stereotype that caring for family members is women's work" that necessitated the passage of the FMLA.

*ECF No. 26* at 6 (quoting *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 731 (2003)).

Because Plaintiffs set forth no facts or legal argument that support a discrimination claim related to their child's disability, summary judgment is granted on this claim.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Kerr County's Motion for Summary Judgment (ECF No. 25). Mark's reasonable accommodation claim shall proceed. Mark and Jennifer's sex discrimination claims based on the alleged sick leave order shall proceed. All other claims are dismissed with prejudice.

**It is so ORDERED this 7th day of September 2021.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**